# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RHONDA HAWKS,** | |
| **Plaintiff,** | |
| **v.** | |
| **THE PNC FINANCIAL SERVICES GROUP INC., and** | **Civil Action No. 2:21-cv-00612-LPL** |
| **THE PNC FINANCIAL SERVICES GROUP, INC. AND AFFILIATES LONG-TERM DISABILITY PLAN,** | |
| **Defendants.** | |

## MEMORANDUM in SUPPORT of
## PLAINTIFF'S MOTION for SUMMARY JUDGMENT

# Table of Contents

Table of Contents ......................................................................................................... i

Introduction ................................................................................................................ 3

Statement of Facts ..................................................................................................... 4

Standard of Review .................................................................................................... 4

Discussion .................................................................................................................. 5

    **A.**     **Ms. Hawks provided sufficient evidence to satisfy her burden of proof.** ......... 5

        1.     Dr. John Lewis' opinions concerning Ms. Hawks supports her claim for LTD benefits. ............................................................................................... 5

        2.     Dr. Ian Anderson's opinions concerning Ms. Hawks support her claim for LTD benefits. ............................................................................................... 6

        3.     Edmond Provder's opinions concerning Ms. Hawks support her claim for LTD benefits. ............................................................................................... 7

        4.     The SSA supports Ms. Hawks' claim for LTD benefits. ........................... 9

    **B.**     **The termination of Ms. Hawks' benefits was improper.** .................................. 10

        1.     Lincoln's decision was *not* supported by substantial evidence. ............... 10

        2.     Lincoln's decision failed to adhere to the Plan's and ERISA's requirements. ........................................................................................... 13

            a.     Lincoln *ignored* Ms. Hawks' treating physicians. ........................ 13

            b.     Lincoln *failed* to identify what information was needed to perfect Ms. Hawks' claim. ...................................................................... 15

            c.     Lincoln *failed* to explain its disagreement with Social Security... 15

        3.     Lincoln's decision demonstrates procedural irregularities, bias and unfairness. ............................................................................................... 18

            a.     Lincoln *failed* to investigate and *admitted* it was *unaware* of the physical demands of Ms. Hawks' occupation. ............................... 18

            b.     Lincoln *refused* to have Ms. Hawks physically examined and relied upon self-serving record reviews. .................................................. 21

            c.     Lincoln *failed* to explain what changed. ....................................... 22

**C.**     **Remedies** ....................................................................................................... **24**

    1.    Reinstatement of benefits............................................................................ 24

    2.    Interest....................................................................................................... 24

    3.    Attorneys' fees and costs. ......................................................................... 25

**Conclusion** ............................................................................................................... **25**

# Introduction

Plaintiff Rhonda Hawks ("Ms. Hawks") is seeking judgment in her favor and against The PNC Financial Services Group, Inc. and Affiliates Long-Term Disability Plan (the "Plan") and PNC Financial Services Group, Inc. ("PNC"). Specifically, Ms. Hawks requests the Court award her the following relief: (i) past due LTD benefits through the date of the Court's order, including interest—with the rate to be determined after further briefing; (ii) award her ongoing LTD benefits pursuant to the Plan; and, (iii) find she is a prevailing party and permitted leave to seek her attorneys' fees and costs. This memorandum provides support for the Court ruling in favor of Ms. Hawks and against the Plan and PNC.

As discussed herein, the Administrative Record ("AR") contains a number of opinions from Ms. Hawks' treaters—Dr. John Lewis and Dr. Ian Anderson—who have provided evidence supporting Ms. Hawks' continued entitlement to LTD benefits both before her benefits were terminated and during the administrative appeal process. *See infra*. Moreover, Ms. Hawks also has the support of the Social Security Administration ("SSA") who found Ms. Hawks disabled not only from her occupation but from ***any gainful occupation***. *Id*. Aside from medical evidence, Ms. Hawks also took it upon herself to provide the Claims Administrator (i.e., Lincoln) with opinions from a Certified Rehabilitation Counselor—establishing her ***inability*** to perform her occupation at PNC, as well as any occupation in the local and national economy.

Despite Ms. Hawks' evidence, Lincoln still terminated her benefits based upon cherry-picked evidence and a failure to investigate. By way of example, Lincoln made ***no effort*** to determine the physical requirements of Ms. Hawks' occupation—despite her still being in the own occupation period. *See* AR 997 ("The physical demands of the job ***are unknown***.") (emph. added). Lincoln also failed to comply with both ERISA and the terms of the Plan. Therefore, Ms. Hawks requests the Court enter judgment in her favor and award her requested relief.

## Statement of Facts

Ms. Hawks cites to her Concise Statement of Undisputed Material Facts, simultaneously filed herewith, which provides a summary of the claims and appeals process, as well as the facts supporting Ms. Hawks' claim for LTD benefits.

## Standard of Review

"The Supreme Court has held that 'a denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

The Plan and PNC ***bear the burden*** of proving the standard of review has been altered from *de novo*. *Id.* ("The plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies.") (quoting *Kinstler v. First Reliance Std. Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999)).  To meet its burden PNC must prove the Plan delegated discretion and the discretion was exercised by a party authorized to do so. *See Lucas v. Liberty Life Assur. Co.*, 2014 U.S. Dist. LEXIS 184860, *21 (E.D.Pa. Mar. 28, 2014) ("Liberty Life has the burden of demonstrating that it was the party that actually made the decision…").

If the arbitrary and capricious standard applies, the Court can overturn the Plan's decision if it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *See Miller v. Am. Airlines, Inc*., 632 F.3d 837, 845 (3d Cir. 2011).  Further, the Court reviews "procedural factors underlying the administrator's decision-making process, as well as structural concerns regarding how the particular ERISA plan was funded, to determine if the conclusion was arbitrary and capricious." *Id*.

**Discussion**

**A.    Ms. Hawks provided sufficient evidence to satisfy her burden of proof.**

Ms. Hawks' Concise Statement of Undisputed Material Facts provides the Court with the

history of her medical conditions and relevant evidence.  The following reiterates the undisputed

factual evidence that supports finding Ms. Hawks satisfied the Plan's definition of Disabled.

**1.    Dr. John Lewis' opinions concerning Ms. Hawks supports her claim for LTD benefits.**

Dr. Lewis has been Ms. Hawks' specialist since her accident and subsequent surgeries.

From April 2018 forward Dr. Lewis has ***supported*** Ms. Hawks' claim for LTD benefits.

Specifically, Dr. Lewis has continually produced his medical records concerning Ms. Hawks and

also routinely completed the forms necessary for Ms. Hawks to continue receiving LTD benefits.

Dr. Lewis' opinions have ***not*** vacillated.  Rather, he has continually noted Ms. Hawks' has

restrictions impeding her ability to work full-time and has ***refused*** to identify any strength level

Ms. Hawks "is capable of performing occupationally on a full-time basis."  By way of example,

and without limitation, the following shows a brief history of Dr. Lewis' medical opinions.

- **May 17, 2018 "Restrictions Form"**

  o   Diagnoses: "Right ankle displaced trimalleolar fracture w/ routine healing S82.851D"
  o   ***No strength level*** was checked for "full-time" work Ms. Hawks could perform.
  o   Physical Restrictions: "All Job Functions Restricted."

*See* AR 1456.

- **January 10, 2019 "Restrictions Form"**

  o   Diagnoses: "Pain due to internal orthopedic prosthetic devices, implants, grafts" and "rt ankle displaced trimalleolar fracture with nonunion"
  o   ***No strength level*** was identified for "full-time" work Ms. Hawks could perform.
  o   "Patient will be out of work for at least 3 months…"

*See* AR 1176.

- **September 12, 2019 "Restrictions Form"**

  o Diagnoses: "Right ankle displaced trimalleolar fracture"
  o ***No strength level*** was identified for "full-time" work Ms. Hawks could perform.
  o "Patient requires post-operative care"

*See* AR 955-956.

- **November 12, 2019 "Restrictions Form"**

  o Diagnoses: "Right ankle displaced trimalleolar fracture"
  o ***No strength level*** was identified for "full-time" work Ms. Hawks could perform.
  o "Activities as tolerated"
  o When asked what treatment and findings support her restrictions and inability to return to work—stating "see records"

*See* AR 485-486.

Contrary to Lincoln's termination letter, Dr. Lewis did ***not*** release Ms. Hawks to return to work. Had he done so, he would have indicated a strength level he believed she was capable for performing on a full-time basis. Rather, as the above history shows, he consistently maintained his opinion that ***Ms. Hawks was and remains unable to perform from full-time work***—disabled.

**2.      Dr. Ian Anderson's opinions concerning Ms. Hawks support her claim for LTD benefits.**

Dr. Anderson has been Ms. Hawks' primary care physician during the relevant time period. Dr. Anderson has supported Ms. Hawks' restrictions impeding her ability to work full-time and supporting her continued receipt of LTD benefits. By way of example, and without limitation, the following is a brief history of Dr. Anderson's medical opinions.

- **November 27, 2019 "Restrictions Form"**

  o Diagnoses: "Type 2 Diabetes Mellitus", "Hypertension", "Closed trimalleolar fractured right ankle."

- o "Unable to stand/walk any substantial length of time"
- o Under restrictions he noted they were continuing to present due to "Disability"
- o Her restrictions were supported by "rt ankle fracture and TTP."
- o When asked what treatment supports her inability to return to work, he stated: "specialty follow-up. Unclear long term prognosis."

*See* AR 544-545.

- **On August 20, 2020 "Physical Capacities Evaluation"**

  - o Ms. Hawks is limited to sitting *1-3 consecutive hours* in an 8-hour workday.
  - o Ms. Hawks is limited to standing and walking *0 consecutive hours* in an 8-hour workday.
  - o Ms. Hawks is *limited to occasionally* climbing stairs.
  - o Ms. Hawks is *restricted* from jumping, stooping, and lifting more than 10 pounds.
  - o Ms. Hawks is *restricted* to working "*1/3 of a day*"

*See* Appendix p.83-85; *see also* AR 178.

Contrary to Lincoln's letter, Dr. Anderson's November 27, 2019 "Restrictions Form" did ***not*** support the termination of Ms. Hawks' benefits. Rather, as discussed herein, Ms. Hawks' occupation was classified as ***light duty***—not sedentary. *See infra*. Moreover, Dr. Anderson confirmed Ms. Hawks' restrictions were imposed to present due to "Disability" and he indicated a specialist was needed for her long-term prognosis (i.e., Dr. Lewis—who had ***not*** released her to full-time work). *See* AR 544. Finally, Dr. Anderson's most recent opinion from August 2020, confirmed he supports Ms. Hawks' inability to work—restricting her to working "1/3 of a day."

**3.     Edmond Provder's opinions concerning Ms. Hawks support her claim for LTD benefits.**

In addition to the above medical opinions, Ms. Hawks also provided Lincoln with two "Employability and Earning Capacity Evaluations" from a Certified Rehabilitation Counselor and Diplomate of the American Board of Vocational Experts—Mr. Provder.

In the first "Employability and Earning Capacity Evaluation", Mr. Provder was asked the

following relevant questions:

1. What is Ms. Hawks' vocational capacity?

2. Could she return to her prior work as a Bank Manager and perform the full range of required work activities?

3. Has her prior work as a Bank Manager provided her with any transferable skills that could be used to perform work requiring less physical capability?

4. If she has no transferable skills, what other types of jobs could she perform on a sustained, competitive basis?

*See* AR 326. Unlike the vocational opinions Lincoln obtained—that provided no analysis, explanation or discussion, Mr. Provder's report provided an ***in-depth*** analysis and explanation of his methods, practices, and how he reached his conclusions. *See* AR 327-350.

In sum, Mr. Provder provided the following relevant opinions:

- Ms. Hawks' occupation at PNC would "be considered Sedentary to Light Work as ***she spent most of her time standing and walking***…She had to attend meetings for the bank and with clients."

- "The results of the vocational evaluation indicate that Ms. Hawks' vocational capacity is so compromised ***she cannot perform work requiring Sedentary Physical demands on a sustained basis***."

- "Given Ms. Hawks' severe limitations and reduced vocational capacity, ***she is precluded from accessing the labor market***."

*Id*. (emph. added).

Following receipt of Lincoln's Transferable Skills Analysis ("TSA") on appeal, Ms. Hawks obtained a second "Employability and Earning Capacity Evaluation" from Mr. Provder. This time Mr. Provder was asked to answer the following questions

1. What is Ms. Hawks' vocational capacity?

2. Could she return to her prior work as a Bank Manager and perform the full range of required work activities?

3. Has her prior work as a Bank Manager provided her with any transferable skills that could be used to perform work requiring less physical capability?

…

6. Does Ms. Hawks meet the definition of "Disabled" as defined under the Lincoln Financial Group Long Term Disability Insurance Policy?

*See* AR 171. Similar to his prior report, Mr. Provder provided an in-depth analysis that detailed his methods and practices. Further, he provided the following opinions:

- Ms. Hawks' occupation at PNC would "be considered Light Work as she spent more time standing and walking. At times, she would have to lift and carry boxes of coins which weighed up to 20 pounds…She had to attend meetings for the bank and with clients."

- "The results of the vocational evaluation indicate that Ms. Hawks' vocational capacity is so compromised *she cannot perform work requiring Sedentary Physical demands on a sustained basis*."

- "The functional limitations imposed by Ms. Hawks' injuries are the major determinants of the opportunities, or lack thereof, available to her for vocational alternatives."

- "It is my opinion, as a vocational expert, that Ms. Hawks is unable to perform the job duties of her prior occupation as a Bank Manager and 'is unable to perform the material duties of any occupation for which she can become qualified to perform by education, training or experience' in the local or national economy."

*See* AR 180, 188-193 (emph. added).

Mr. Provder's opinions are unequivocal—Ms. Hawks *cannot perform her light duty occupation* and *cannot perform any occupation in the national economy* for which she is or can become qualified to perform by education, training or experience.

**4.    The SSA supports Ms. Hawks' claim for LTD benefits.**

As the Plan *required* her to do, Ms. Hawks applied for SSDI benefits. On March 22, 2019, the Social Security Administration ("SSA") *approved* Ms. Hawk claim for SSDI benefits *on application*. Based on her award of SSDI benefits, a neutral third party reviewed the medical

evidence and determined Ms. Hawks satisfied the following definition of disability:

> The law defines disability as the ***inability to engage in any substantial gainful activity*** (SGA) by reason of any medically determinable physical impairment(s)…which has lasted or can be expected to last for a continuous period of not less than 12 months.

*See* https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (emph. added).

* * * * * * *

Based on the above, Ms. Hawks has submitted substantial evidence establishing she satisfies the Plan's definition of Disability.

**B.      The termination of Ms. Hawks' benefits was improper.**

As discussed above, Ms. Hawks did everything the Plan required—submitting evidence proving she satisfied, and continues to satisfy, the definition of Disabled.  However, as discussed below, PNC and the Plan—acting through Lincoln—***failed*** to substantiate the termination of Ms. Hawks' LTD benefits with sufficient evidence.  Further, they failed to adhere to the requirements of the Plan and ERISA—making their decision arbitrary and capricious.

**1.      Lincoln's decision was *not* supported by substantial evidence.**

To pass muster, Lincoln's decision was ***required*** to be supported by substantial evidence. *See Miller*, 632 F.3d at 845.  The only evidence Lincoln had to rely upon for terminating Ms. Hawks' claim was the opinion of an—at the time—unnamed record reviewer and an Occupational Analysis.  Neither of these pieces of evidence provide Lincoln the necessary substantial evidence to terminate Ms. Hawks' LTD benefits.

According to the termination letter, Lincoln's medical reviewer found Ms. Hawks could only "stand or walk at a modest pace continuously for brief periods of less than 15 minutes at a time." *See* AR 496.  The reviewer made ***no comment*** on how long Ms. Hawks could stand/walk over the course of a full-time 8-hour workday.  This is relevant given, even if Ms. Hawks'

occupation was defined as "sedentary", the record reviewer did ***not*** provide an opinion that Ms.

Hawks could walk or stand occasionally throughout the workday (i.e., up to 1/3 of the time).

Conversely, Ms. Hawks' treater—Dr. Lewis—confirmed she was ***unable to perform any***

***occupational strength level on a full-time basis***. *See supra*.

Next, Lincoln's Occupational Analysis was substantially flawed for a number of reasons.

*First*, as discussed more below, Lincoln did ***not*** investigate the physical demands of Ms. Hawks'

occupation. *See infra*; *see also* AR 997 ("<u>Job Physical Demands</u>: Unknown").  Had Lincoln done

so, it would have determined her occupation was ***"light" duty*** and ***not "sedentary."***[1]  Rather,

Lincoln relied upon a generalized occupational category title of "Manager, Financial Institution"

to support Ms. Hawks' occupation being defined as "sedentary." *Id*.  Notably, the occupational

category title Lincoln relied upon contains ***multiple*** occupational titles and not one ***specific to***

***Ms. Hawks' occupation with PNC***. *See infra*.  The following chart exemplifies this fact—not

just for Lincoln's original termination but also the occupations it identified on appeal.

| DOT Code | Occupational Category Title | O*Net Code[2] | Occupation Titles[3] |
|---|---|---|---|
| 186.167-086 | Manager, Financial Institution | 11-3031.00 | 12 |
| 169.167-038 | Order Department Supervisor | 41-1012.00 | 8 |
| 241.137-014 | Supervisor, Customer Complaint | 43-1011.00 | 11 |
| 186.267-018 | Loan Officer | 13-2072.00 | 7 |

*Second*, the vocational case manager ("VCM") only used the restrictions/limitations from

Lincoln's in-house medical nurse—there was no discussion of Ms. Hawks' treaters. *See* AR 996.

> A vocational expert's opinion that a claimant can perform certain jobs is
> only substantial evidence to the extent that the vocational expert had a
> complete, accurate understanding of the claimant's restrictions...

*Neaton v. Hartford Life & Acc. Ins. Co.*, 517 F.App'x 475, 485 (6th Cir. 2013).  Notably, on

---

[1]  *See infra*; *see also* AR 336 ("…this occupation would be considered Light Work…").
[2]  These codes came from the O*Net crosswalk. *See* https://www.onetonline.org/crosswalk/
[3]  *See* https://www.bls.gov/soc/2018/soc_2018_direct_match_title_file.pdf

appeal, Lincoln's Transferable Skills Analysis suffered this same flaw. *See* AR 233.  Further,

neither vocational person for Lincoln **met with** Ms. Hawks. *See* AR 997, 234.

    *Third*, the Occupational Analysis only looked at certain physical demands of the

occupational category for "Manager, Financial Institution."  Specifically, the VCM only pointed

to the following physical demands: (i) frequent reaching, handling, sitting, and fingering; and (ii)

occasional standing and walking. *See* AR 997.  However, these are not the only physical

demands of the occupation.  Rather, O\*Net[4] provides "Standardized Scores" that identify the

importance of certain "physical work conditions" for occupations.[5]  Relevant here, the O\*Net

provides scores for sitting, standing, walking, climbing, crawling, and balancing. *Id*.  The

following chart provides the scores for the occupation identified in Lincoln's original termination

and the occupations it identified on appeal.

| Occupation | Code | Sit[6] | Stand | Walk | Climb | Crawl | Balance |
|---|---|---|---|---|---|---|---|
| Manager, Financial Institution | 11-3031.00 | 79 | 23 | 18 | 4 | 4 | 3 |
| Order Department Supervisor | 41-1012.00 | 68 | 37 | 39 | 9 | 22 | 9 |
| Supervisor, Customer Complaint | 43-1011.00 | 83 | 29 | 17 | 1 | 6 | 3 |
| Loan Officer | 13-2072.00 | 90 | 29 | 19 | 0 | 1 | 4 |

    As the chart makes clear, each occupation requires at least some climbing, crawling and

---

[4]    O\*Net provides more up-to-date information given the Dictionary of Occupational Titles ("DOT") is vastly outdated.  By way of example, "Manager, Financial Institution" was last updated in 1988—making its relevancy questionable. *See* AR 998; *Prado v. Allied Domecq Spirits & Wine Grp. Disability Income Policy*, 2008 U.S. Dist. LEXIS 4295, at \*24 (N.D.Cal. Jan. 22, 2008) ("The DOT's relevance to the present case is questionable for other reasons as well. According to Liberty's own Vocational Case Manager, the description for Plaintiff's occupation in the DOT was last updated in 1977, making its relevancy today questionable.").

[5]    *See* https://www.onetonline.org/find/descriptor/browse/Work_Context/4.C.2/; https://www.onetonline.org/help/online/scales#score.

[6]    *See* https://www.onetonline.org/find/descriptor/browse/Work_Context/4.C.2/ —selecting the relevant categories for each physical work conditions and searching for the specific code.

balancing—all things Ms. Hawks is **_unable to do_**. *See e.g.* AR 233 ("The claimant can **_never_** crawl, balance, climb ladders/poles, etc.). As such, Ms. Hawks **_could not perform any_** of the occupational titles under "Manager, Financial Institution" or any of those identified on appeal.

* * * * * * * *

Therefore, Lincoln's termination of Ms. Hawks' LTD benefits was **_not_** based on substantial evidence. As such, its termination cannot pass muster and should be reversed.

### 2. Lincoln's decision failed to adhere to the Plan's and ERISA's requirements.

Both the Plan and ERISA set the minimum standards Lincoln was required to adhere to in its administration of Ms. Hawks' claim for LTD benefits. As discussed below, Lincoln's action violated multiple provisions of both the Plan and ERISA.

### a. Lincoln *ignored* Ms. Hawks' treating physicians.

Under both ERISA and the Plan, Lincoln was **_required_** to explain why it disagreed with Ms. Hawks' treating physicians.

> If your claim is denied, the notice of denial will include… discussion of the decision, including an explanation for disagreeing with or not following: [i] the views presented by you of health care professionals treating you and vocational professionals who evaluated you…

AR 98; *see also* 29 CFR 2560.503-1(g)(1)(vii)(A)(i). The same holds true for an appeal denial.

> (6) In the case of an adverse benefit decision with respect to disability benefits…(i) A discussion of the decision, including an explanation of the basis for disagreeing with or not following: (A) The views presented by the claimant to the plan of health care professionals treating the claimant and vocational professionals who evaluated the claimant…

29 CFR 2560.503-1(j)(6)(i)(A). However, in regard to Ms. Hawks, neither the original termination letter nor the appeal denial letter conformed to these requirements.

*First*, in the January 6, 2020 termination letter, the only discussion of Dr. Lewis was:

> Dr. Lewis indicated on November 12, 2019 that you can perform activities as tolerated on a restrictions form and in medical records noted you would

always have some pain and stiffness of the right ankle.

AR 496. However, this ***ignores*** the entirety of Dr. Lewis' November 12, 2019 Restrictions

Form. Specifically, when asked to select a strength level Ms. Hawks "is capable of performing

occupationally on a full-time basis", Dr. Lewis did ***not*** make any selection—consistent with his

prior opinions and indicating his belief that Ms. Hawks ***remained*** unable to perform any work on

a full-time basis.[7]

  *Second*, in the November 12, 2020 appeal denial, there was no discussion of Dr. Lewis'

opinions concerning Ms. Hawks. *See* AR 147-156. Moreover, despite recognizing Dr. Anderson

provided an additional opinion concerning Ms. Hawks, Lincoln failed to address it in any

manner. *See* AR 153 ("Mr. Provder appears to have relied solely on one physician (Dr.

Anderson) that did not give fulltime work capacity…"). As both Mr. Provder's report and the

Physical Capacities Evaluation confirm, Dr. Anderson supported Ms. Hawk's claim for benefits.

> Dr. Ian Anderson (8/20/20) on Physical Capacity Evaluation States: "Sit
> 1-3 hours, Stand 0 hour, Walk 0 hours, Occasionally Climb Stairs, Lift 10
> pounds Occasionally and can work only 1/3 of the day.

*See* AR 178.[8] Moreover, the appeal denial letter accepted without question or explanation the

TSA addendum from Lincoln's in-house personnel—ignoring Mr. Provder's report.

  Despite the requirement under the Plan and ERISA, in terminating Ms. Hawks' LTD

benefits and denying her appeal, Lincoln failed to explain why it relied upon "the opinions of

non-treating physicians over those of treating physicians", including the vocational opinions.[9]

This supports finding the termination of Ms. Hawks' benefits was arbitrary and capricious.

   ***…Despite paying lip service to the opinions of plaintiff's treating***

---

[7] Notably, Dr. Anderson's Restrictions Form would support Ms. Hawks' inability to perform
her own occupation, which was light duty. *See supra*.

[8] *See also* Appendix, pp.83-85.

[9] *Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F.Supp.2d 261, 287 (W.D. Pa. 2008).

> *doctors, MetLife's letter breezed past a summary of their opinions*,
> outlined its own consultants' opinions, and concluded with scant analysis
> that plaintiff was capable of working full-time. *An insurer's unreasoned*
> *preference for its own consultants' opinions undermines the legitimacy*
> *of its eligibility determination*.

*Holmes v. Metro. Life Ins. Co.*, 2011 U.S. Dist. LEXIS 122525, at *31-32 (M.D. Pa. Aug. 12,

2011) (emph. added) (internal citations omitted).

      **b.**      **Lincoln *failed* to identify what information was needed to perfect Ms. Hawks' claim.**

Under both ERISA and the Plan, upon the denial or termination of a claim, Lincoln's

notification letter was ***required*** to describe "any additional material of information necessary…to

perfect the claim and an explanation of why such material or information is necessary." *See* AR

98; 29 CFR 2560-503-1(g)(1)(iii).  However, in its termination letter to Ms. Hawks, Lincoln was

***silent*** as to what additional information Ms. Hawks needed to provide.  Rather, Lincoln simply

said it could change its mind based "on any additional information that may be submitted" (*See*

AR 496)—this is insufficient and supports finding the decision was arbitrary and capricious.

> Given that ***the letter did not set forth any additional instruction as to how***
> ***Miller could achieve a favorable disability determination***, it does not
> comply with 29 C.F.R. § 2560.503-1(g)(1)(iii). The termination letter here
> does not satisfy the basic procedural mandates of ERISA, as set forth in §
> 503 and the relevant regulations….For that reason, ***American's***
> ***noncompliance with the statute weighs in favor of finding that their***
> ***decision was arbitrary and capricious***.

*Miller*, 632 F.3d at 852-53 (emph added).

      **c.**      **Lincoln *failed* to explain its disagreement with Social Security.**

Under both ERISA and the Plan, Lincoln was ***required*** to explain why it disagreed with a

decision from the SSA.

> If your claim is denied, the notice of denial will include… discussion of
> the decision, including an explanation for disagreeing with or not
> following: …[iii] a disability determination provided by you to the Plan
> made by the Social Security Administration…

AR 98; *see also* 29 CFR 2560.503-1(g)(1)(vii)(A)(iii).  The same holds true for an appeal denial.

> (6) In the case of an adverse benefit decision with respect to disability benefits…(i) A discussion of the decision, including an explanation of the basis for disagreeing with or not following: …(C) A disability determination regarding the claimant presented by the claimant to the plan made by the Social Security Administration…

29 CFR 2560.503-1(j)(6)(i)(C).  However, in regard to Ms. Hawks, neither the original termination letter nor the appeal denial letter conformed to these requirements.

*First*, in the January 6, 2020 termination letter, Lincoln made **no discussion** of Ms. Hawks' award of SSDI benefits. *See* AR 495-497.  Rather, Lincoln was **completely silent** on the issue—despite being aware that Ms. Hawks had been approved for SSDI benefits and even requesting she reimburse it for an overpayment. *Id.*; *see also* AR 47.  Lincoln's actions violated the terms of the Plan and ERISA—making its decision arbitrary and capricious.

> The fact that the SSA found Plaintiff disabled under this much narrower definition and Liberty Life's failure to consider that fact in finding that Plaintiff was not disabled under its own broader definition gives this Court pause and must be "considered as a factor in determining whether an ERISA administrator's decision to deny benefits was arbitrary and capricious[.]"

*Branca*, 2014 U.S. Dist. LEXIS 46682, at *36 (citing *Brandeburg v. Corning Inc. Pension Plan for Hourly Emples.*, 243 F. App'x 671, n.3 (3d Cir. 2007)).

*Second*, in its appeal denial, Lincoln for the **first time** offered an explanation for disagreeing with the Social Security Administration's ("SSA") decision.  Lincoln's inclusion of this **new reason** at the appeals stage is inappropriate violates ERISA.

> Under ERISA, a claimant is entitled to procedural fairness and "full and fair review" of all determinative reasons for the initial denial of benefits claims… "Full and fair" review must provide a claimant with knowledge of the opposing party's contentions and a reasonable opportunity to meet them." …Thus, "tacking on" an additional basis of denial constitutes a "procedural irregularity" that violates ERISA.

*Mullica v. Minn. Life Ins. Co.*, 2013 U.S. Dist. LEXIS 140271, at *16-17 (E.D. Pa. Sep. 27, 2013); *Bradley v. Liberty Life Assurance Co.*, 2016 U.S. Dist. LEXIS 80895, at *27 (D.N.J. June 21, 2016) ("Adding a reason for denying benefits at the appeals stage is inappropriate, as other courts have determined…").

> When an administrator tacks on a new reason for denying benefits in a final decision, thereby precluding the plan participant from responding to that rationale for denial at the administrative level, the administrator violates ERISA's procedures.

*Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 974 (9th Cir. 2006).

Moreover, Lincoln's discussion of the SSA decision is nothing more than a conclusion—it provides no explanation. Instead, Lincoln simply contends it considered "the vocational review and medical reviews by Dr. Stander, Dr. Broomes and Dr. Green that were not considered by the Social Security Administration in its determination process." *See* AR 156. Lincoln's argument is without merit given it did not request or obtain Ms. Hawks' SSDI claim file. Further, Lincoln's explanation fails to address the SSA's standard for disability—treating the award as irrelevant except for purposes of its requested overpayment.

> While it is true that a social security award "does not in itself indicate that an administrator's decision was arbitrary and capricious and a plan administrator is not bound by the SSA decision,", ***the mere noting of the same and treating it as "essentially irrelevant" is cause for suggesting that unfairness occurred***.

*Porter v. Broadspire*, 492 F.Supp.2d 480, 487 (W.D.Pa. 2007) (citing *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 Fed. Appx. 266 (3d Cir. 2006) (emph. added); *Weinberger v. Reliance Std. Life Ins. Co.*, 54 Fed. Appx. 553 (3d Cir. 2002)).

Therefore, Lincoln's failure to consider Ms. Hawks' award of SSDI benefits at the termination stage supports finding the decision to terminate Ms. Hawks' benefits was arbitrary

and capricious.  Further, Lincoln's *post hoc* and inappropriate appeal reasoning is without merit. This is especially true given Ms. Hawks was awarded SSDI benefits **on application** (i.e., the claim level)—something that is "not easily won."[10]

### 3. Lincoln's decision demonstrates procedural irregularities, bias and unfairness.

In addition to the above failures to adhere to the Plan and ERISA, courts in the Third Circuit have recognized a number of acts that demonstrate a plan's procedural irregularities, bias, or unfairness in review.  Those actions include, but are not limited to:

> …reliance on the ***opinions of non-treating physicians over those of treating physicians*** without explanation…; failure to follow the plan's notification provisions or ***reliance on self-serving paper reviews of medical files***…; reliance on inadequate information or ***incomplete investigations***…; subsequent disregard of opinions previously relied upon and/or selective use of those opinions…; and an inattentive or biased review process evidenced by the failure to seriously consider a treating physician's conclusions or ***cursory analysis of medical reports***…

*Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F. Supp. 2d 261, 287 (W.D. Pa. 2008) (citations omitted) (emph added).  As discussed below, Lincoln's administration of Ms. Hawks' claim involved multiple of the above actions—weighing in favor of finding the decision to terminate her benefits to be arbitrary and capricious.

#### a. Lincoln *failed* to investigate and *admitted* it was *unaware* of the physical demands of Ms. Hawks' occupation.

At the time Ms. Hawks' LTD benefits were terminated, the relevant definition of Disabled under the Plan was as follows:

> **For the first 24 months (from the date LTD benefits begin)**: you are disabled if your disability makes you ***unable to perform the material or essential duties of your own occupation*** as it is normally performed in the national economy.

---

[10] *Weinberger v. Reliance Standard Life Ins. Co.*, 54 F. App'x 553, 558 (3d Cir. 2002) (Judge Fullam, Concurring) ("Persons familiar with Social Security disability litigation are certainly aware that the award of disability benefits at the administrative level is not easily won.").

*See* AR 89 (emph. added). While the definition refers to the "national economy", Lincoln was

*not* free to disregard Ms. Hawks' ***actual job requirements***. Rather, the failure of an ERISA

administrator to do so makes its decision arbitrary and capricious.

> Liberty Life ***acted arbitrarily and capriciously*** when it relied upon its
> vocational analysts' reports that ***did not consider the plaintiff's actual job
> requirements*** when determining the duties of his occupation in the
> national economy.

*Van Arsdel v. Liberty Life Assurance Co*., 267 F.Supp.3d 538, 576 (E.D.Pa.2017) (emph. added).

> Moreover, this Court takes issue with the manner in which Liberty Life so
> readily disregarded Plaintiff's actual job duties when determining whether
> Plaintiff was able to perform her "Own Occupation."
> …
> As it did in *Kavanay*, ***Liberty Life conflated Plaintiff's actual job duties***
> requiring her to travel from site to site ***with a job description that better
> suited its conclusion that Plaintiff's work was sedentary***. This Court
> agrees with the *Kavanay* court's reasoning and its holding that such an
> analysis under the "Own Occupation" language of Liberty Life's policy
> ***"amounts to an abuse of discretion and cannot stand."***

*Branca v. Liberty Life Assurance Co*., 2014 U.S. Dist. LEXIS 46682, at *43-45 (E.D. Pa. Apr. 3,

2014) (citing *Kavanay v. Liberty Life Assurance Company of Boston*, 914 F.Supp.2d 832

(S.D.Miss. 2012) (emph. added).[11]

> Though her precise duties do not define her regular occupation, in this
> case they well illustrate the duties of a director of nursing at a small health
> care facility, and nothing in the record provides any basis for thinking that
> such a position at a facility comparable to hers requires different duties.

---

[11]   In both *Van Arsdel* and *Branca*, the courts were reviewing disability policies with similar
definitions to Ms. Hawks'—an insured's own occupation looked to how it was performed in the
national economy. *See Van Arsdel*, 267 F.Supp.3d at 575 ("For purposes of determining
disability under this policy, Liberty [Life] will consider the Covered Person's occupation as it is
***normally performed in the national economy***.") (emph. added); *Branca*, 2014 U.S. Dist. LEXIS
46682, at *3 (same). Notably, these Liberty cases are inherently relevant here given Lincoln
bought out Liberty and took over this particular book of business—apparently maintaining the
same problematic claim administration processes.

*Burtch v. Hartford Life & Accident Ins. Co.*, 314 F.App'x 750, 755 (5th Cir. 2009) (citing

*Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243 (2d Cir. 1999)) (emph. added);

*see also Card v. Principal Life Ins. Co.*, 790 F.App'x 730, 742 (6th Cir. 2019).

In this case, Lincoln ***refused*** to consider or even investigate Ms. Hawks' actual job duties

as a Banking Center Manager. Rather, on multiple occasions, the Administrative Record

demonstrates that Lincoln ***conceded*** the physical demands of Ms. Hawks' job were "unknown."

- "Job Physical Demands: Unknown" (AR 997)

- "The physical demands of the job are unknown." (*Id*.)

- "The physical demands of the job are unknown." (AR 149)

As the above cases make clear, Lincoln was ***required*** to consider Ms. Hawks' ***actual*** job

duties. However, the Plan did ***not*** do so and, as discussed in Mr. Provder's reports, misclassified

her occupation, which required physical demands exceeding the sedentary level.

> …this occupation ***would be considered Light Work as she spent more
> time standing and walking***. At times, she would have to lift and ***carry
> boxes of coins which weighed up to 20 pounds***. It is classified as skilled
> work. She had to attend meetings for the bank and with clients.

*See* AR 180 (emph. added).

The requirement to review a participant's ***actual*** job duties is necessary given an

occupation identified in the Dictionary of Occupational Titles ("DOT") and O*Net—both

utilized by Lincoln—is ***not*** specific but corresponds to a ***category*** of occupations.[12]

> It points out that the DOT contains no separate listing for an orthopedic
> surgeon, which appears as an undefined related title under the "surgeon"
> heading. Therefore, applying the definition of surgeon, which does not
> refer to on-call and emergency duties, Reliance argues that these duties are
> immaterial. ***We agree with the District Court that the DOT's silence***

---

[12]   *See* https://www.bls.gov/soc/2018/major_groups.htm#11-0000 ("11-3031 Financial
Managers…examples: Bank Branch Manager, Comptroller, Financial Director"); *see also supra*
(chart on number of occupational titles under the occupational category title).

> *about this critical issue makes the DOT unhelpful and thus*, to the extent
> that Reliance's conclusion is based on the DOT's definition of surgeon,
> *that conclusion is unreasonable*.

*Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 387 n.5 (3d Cir. 2003) (emph. added).

Therefore, Lincoln's failure to conduct the appropriate investigation into the physical demands of Ms. Hawks' occupation supports finding the decision to terminate Ms. Hawks' benefits was arbitrary and capricious.

        **b.**        **Lincoln *refused* to have Ms. Hawks physically examined and relied upon self-serving record reviews.**

Under the terms of the Plan, Lincoln was permitted to have Ms. Hawks examined as part of its claims administration process. *See* AR 94-95; *see also* AR 1482 ("[Lincoln] may investigate any claim and/or request that the claimant be examined at any point during the life of the claim."). While there is no requirement for Lincoln to have Ms. Hawks examined, the failure to do so weighs in favor of finding a decision arbitrary and capricious—especially where her treater supports her disability.

> *The absence of an examination is a factor in analyzing the differences
> in the opinions of the consultant and the treating physician*. There is no
> obligation on the insurer to have an insured examined by a physician.
> However, where the insured's treating physician's disability opinion is
> unequivocal and based on a long term physician-patient relationship,
> *reliance on a non-examining physician's opinion premised on a records
> review alone is suspect and suggests that the insurer is looking for a
> reason to deny benefits*.

*Morgan v. Prudential Ins. Co. of Am.*, 755 F.Supp.2d 639, 647 (E.D.Pa. 2010) (emph. added).[13]

> If Hartford had made its termination decision without asking Minutello to
> undergo a physical examination or a functional capacity evaluation, its
> failure to "objectively measure her physical abilities" would have
> constituted a ground for setting that decision aside.

---

[13]  *See also Levine v. Life Ins. Co. of N. Am.*, 2016 U.S. Dist. LEXIS 53286, *25-26 (E.D.Pa. Apr. 21, 2016); *Haisley v. Sedgwick Claims Mgmt. Servs., Inc.*, 776 F. Supp. 2d 33, 49 (W.D.Pa. 2011) ( "the failure to procure such an examination may be unreasonable where the specific impairments or limitations at issue are not amenable to consideration by means of a file review").

*Minutello v. Hartford Life & Accident Ins. Co*., 964 F.Supp.2d 491, 510 (W.D.Pa. 2013).

In this case, Ms. Hawks specifically requested Lincoln have her undergo a physical examination. *See* AR 303 ("We also urge Lincoln to have a physician examine Rhonda…"). However, Lincoln refused to have Ms. Hawks examined—relying instead on two record reviews. Based on *Morgan*, Lincoln's refusal is relevant given Ms. Hawks' treaters ***supported*** her claim for benefits—Dr. Lewis ***never*** identified a strength level of work Ms. Hawks could perform.

Moreover, the need for a physical examination—and Lincoln's failure to obtain one—is all the more relevant where, as here, the disabling condition revolves around chronic pain, which is inherently subjective.

> The court determined that ***the plan's decision to terminate the plaintiff's benefits was arbitrary and capricious***, in part, because of its failure to conduct an IME and due to its reliance on ***a paper review that discounted and ignored documented reports of pain***.

*Moustafa v. ReliaStar Life Ins. Co*., 2016 U.S. Dist. LEXIS 155257, at *21-22 (D.N.J. Nov. 8, 2016) (emph. added); *Gessling v. Grp. Long Term Disability Plan for Emples. of Sprint/United Mgmt. Co.*, 693 F.Supp.2d 856, 866 (S.D.Ind. 2010) ("…a mere record review is not sufficient to provide a reasonable basis for discounting…accounts of his pain and resulting limitations.").

> …the failure to procure such an examination may be unreasonable where the specific impairments or limitations at issue are not amenable to consideration by means of a file review.

*Songer v. Reliance Standard Life Ins. Co*., 106 F.Supp.3d 664, 675 (W.D.Pa. 2015).

Therefore, Lincoln's failure to have Ms. Hawks physically examined supports finding the decision to terminate Ms. Hawks' benefits was arbitrary and capricious.

### c.    Lincoln *failed* to explain what changed.

From April 2018 through January 2020—over twenty-one (21) months, Lincoln found Ms. Hawks satisfied the Plan's definition of Disability—unable to perform the material duties of

her own occupation. *See supra*.  Lincoln's continued approval was based on the support of Ms.

Hawks' treating physician—Dr. Lewis—who completed the Restrictions Form as requested and

continually refused to select a strength level Ms. Hawks could perform "occupationally on a full-

time basis"—again indicating his belief that Ms. Hawks **remained** unable to perform any work

on a full-time basis. *See e.g.* AR 1327, 1176.

When Lincoln terminated Ms. Hawks' LTD benefits it did so with virtually the same

medical records—Dr. Lewis' consistent refusal to identify a strength level Ms. Hawks could

perform on the Restrictions Form. *See* AR 485.  However, Lincoln ***failed*** to explain what

changed and how Ms. Hawks all of the sudden did not satisfy the Plan's definition of Disability.

Lincoln's failure to do so supports finding the decision to terminate Ms. Hawks' benefits was

arbitrary and capricious.

> An administrator's reversal of its decision to award a claimant benefits
> without receiving any new medical information to support this change in
> position is an irregularity that counsels towards finding an abuse of
> discretion.

*Miller v. Am. Airlines, Inc*., 632 F.3d 837, 848 (3d Cir. 2011).

> In short, Sun Life relied on virtually the same medical records for a decade
> and has pointed to no information available to it that altered in some
> significant way its previous decision to pay benefits….Here, ***Sun Life***
> ***accepted Roehr's records as proof of a qualifying disability and then***
> ***later, without expressing any concerns to Roehr, used essentially the***
> ***same records to find Roehr failed to establish an ongoing, qualifying***
> ***disability***. While Roehr bears the burden of proving entitlement to
> benefits, this Court has explained that ***a plan administrator's reliance on***
> ***the same evidence to both find a disability and later discredit that***
> ***disability does not amount to a reliance on "substantial***
> ***evidence."***…This is especially true where the administrator has made no
> "attempt to reconcile" its previous conclusions with the new
> recommendations.

*Roehr v. Sun Life Assurance Co*., 2021 U.S. App. LEXIS 38130, at *15 (8th Cir. Dec. 27, 2021)

(emph. added).

**C.    Remedies**

To the extent the Court finds in Ms. Hawks' favor, the sole remaining question is what remedy to award.  As discussed below, Ms. Hawks requests reinstatement of her benefits, interest on past-due benefits—with the parties to separately brief the applicable interest rate, and for leave to separately move for her attorneys' fees and costs.

**1.    Reinstatement of benefits**

The Court is permitted to reinstate Ms. Hawks' LTD benefits through the date of this order (with interest) or to remand this case to the Plan for it to render a full and fair review. *See Miller*, 632 F.3d 837, 856.  However, the Third Circuit has identified the proper remedy when ERISA benefits were ***terminated***—compared to denying benefits at the outset—is to restore the *status quo* (i.e., place the participant back in pay status).

> In deciding whether to remand to the plan administrator or reinstate benefits, we note that it is important to consider the status quo prior to the unlawful denial or termination. … ***In the termination context,*** however, a finding that a decision was arbitrary and capricious means that the administrator terminated the claimant's benefits unlawfully. Accordingly, ***benefits should be reinstated to restore the status quo***.

*Id*. at 856-57 (emph. added).

Here, given the substantial evidence support Ms. Hawks satisfying the Plan's definition of Disability and because she has shown the Plan improperly terminated her LTD benefits— based on both the medical evidence and procedural anomalies—the Court should reinstate her benefits "to restore the status quo." *Id*.

**2.    Interest**

"Payment for the time-value of money in the form of 'an award of [prejudgment] interest is an equitable remedy enforcing an ERISA plan provision… within the meaning of section 502(a)(3)(B).'" *Zebrowski v. Evonik Degussa Corp. Admin. Comm*., 2012 U.S. Dist. LEXIS

166015, *10 (E.D.Pa. Nov. 20, 2012). In the Third Circuit "interest is presumptively appropriate when ERISA benefits have been delayed." *Fotta v. Trs. of the UMW Health & Ret. Fund of 1974*, 165 F.3d 209, 214 (3d Cir. 1998). To the extent the Court finds in her favor, given the space constraints in this brief, Ms. Hawks requests leave to address the applicable rate of prejudgment interest in a separate filing.

### 3.     Attorneys' fees and costs.

If the Court finds in her favor, Ms. Hawks should also be awarded her attorneys' fees and costs in accordance with ERISA § 1132(g)(1) and the Supreme Court's directive in *Hardt v. Reliance Standard Life Ins. Co.,* 560 U.S. 242 (2010). *Hardt* held that an ERISA plan participant is entitled to an award of their fees and costs upon achieving "some degree of success on the merits." *Id*. at 245. Under either an out-right award of benefits or a remand, Ms. Hawks is considered to have achieved "some degree of success on the merits." *See Berkoben v. Aetna Life Ins. Co*., 2014 U.S. Dist. LEXIS 97664, at *20 (W.D. Pa. July 18, 2014). Further, in order to be made whole, Ms. Hawks should be awarded her attorneys' fees and costs in full. *See CIGNA Corp. v. Amara*, 563 U.S. 421, 443-444 (2011).

As above, to the extent the Court finds in her favor, given the space constraints in this brief, Ms. Hawks requests leave to address the applicable factors and detail necessary to support the Court awarding her attorneys' fees and costs.

### Conclusion

Based on the foregoing and as discussed more herein, Ms. Hawks requests the Court enter judgment in her favor and award her the following relief: (i) past due LTD benefits through the date of the Court's order, including interest—with the rate to be determined after further briefing; (ii) award her ongoing LTD benefits pursuant to the Plan; and, (iii) find she is a prevailing party and permitted leave to seek her attorneys' fees and costs

Date: January 4, 2022

Respectfully Submitted,

/s/ Andrew M. Grabhorn

Andrew M. Grabhorn, *pro hac vice*
*a.grabhorn@grabhornlaw.com*
**Grabhorn Law | Insured Rights®**
2525 Nelson Miller Parkway, Suite 107
Louisville, KY 40223
p: (502) 244-9331
f: (502) 244-9334

Jonathan K. Cohn (PA ID No. 92755)
*jcohn@stembercohn.com*
**STEMBER COHN &
DAVIDSON-WELLING, LLC**
The Hartley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA 15219
T.: (412) 338-1445
F.: (412) 338-1446

*Counsel for Plaintiff*