# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RHONDA HAWKS,**<br><br>         **Plaintiff,**<br>**v.**<br><br>**THE PNC FINANCIAL SERVICES GROUP INC., and**<br><br>**THE PNC FINANCIAL SERVICES GROUP, INC. AND AFFILIATES LONG-TERM DISABILITY PLAN,**<br><br>         **Defendants.** | **Civil Action No. 2:21-cv-00612-LPL** |

## MEMORANDUM in OPPOSITION to
## DEFENDANTS' MOTION for SUMMARY JUDGMENT

# Table of Contents

Introduction ................................................................................................................ 1

Statement of Facts .................................................................................................... 2

Standard of Review .................................................................................................. 2

Discussion .................................................................................................................. 4

    A.    The termination of Ms. Hawks' LTD benefits was arbitrary and capricious. 4

        1.    The termination of Ms. Hawks' LTD benefits was *not* well supported and reasoned. ............................................................................................. 4

            a.    Ms. Hawks' evidence did support her Disability. ........................... 4

            b.    Lincoln Life's reliance on a record review was flawed. ................. 7

            c.    Lincoln Life's reliance on the occupational analysis was flawed... 7

                i.    The occupational analysis *failed* to conduct an investigation into the physical demands of Ms. Hawks' occupation. ...... 7

                ii.    The occupational analysis failed to consider *all* of Ms. Hawks' medical information ............................................. 11

                iii.    The occupational analysis did *not* consider *all* physical demands. ........................................................................... 12

            d.    Additional flaws in Lincoln Life's termination decision. ............. 13

                i.    Lincoln Life *ignored* Ms. Hawks' treating physicians. .... 13

                ii.    Lincoln Life *failed* to identify what information was needed to perfect Ms. Hawks' claim. ............................................. 13

                iii.    Lincoln Life *failed* to explain its disagreement with Social Security. ........................................................................... 14

        2.    The appeal decision was neither reasonable nor correct. .......................... 15

            a.    Ms. Hawks provided additional medical and vocational evidence to support her continued disability. .................................................. 15

            b.    Lincoln Life's reliance on record reviews was flawed. ................. 16

            c.    Lincoln Life's reliance on the occupational analysis was flawed. 18

d.    Ms. Hawks' supplemental evidence *supports* her Disability........ 19

e.    Lincoln Life's appeal denial was fatally flawed. .......................... 20

**B.    Termination of Ms. Hawks' LTD benefits was *not* correct............................. 23**

**C.    Remedies. ........................................................................................................ 23**

1.    Reinstatement of benefits........................................................................... 24

2.    Interest........................................................................................................ 24

3.    Attorneys' fees and costs. .......................................................................... 25

**Conclusion .................................................................................................................. 25**

**Introduction**

Defendants The PNC Financial Services Group, Inc. and Affiliates Long-Term Disability Plan (the "Plan") and PNC Financial Services Group, Inc. ("PNC") (collectively "Defendants") have filed a motion for summary judgment requesting the Court find Plaintiff Rhonda Hawks ("Ms. Hawks") "is not entitled to receive additional LTD benefits." *See* Dkt 39, p.24.  This response memorandum, as well as Ms. Hawks' competing motion for summary judgment (Dkt 43), support the Court ***denying*** Defendants' motion for summary judgment and ***granting*** Ms. Hawks' motion for summary judgment.

As discussed herein, the Administrative Record ("AR") is replete with evidence supporting Ms. Hawks satisfying the Plan's definition of Disability—thereby entitling her to continued LTD benefits. *See infra*.  Specifically, Ms. Hawks' treating physicians did ***not*** release her to return to work—confirming even on appeal she is unable to work full-time. *See e.g.* AR 485 (Dr. Lewis' "Restrictions Form" not identifying a strength level Ms. Hawks could perform full-time); AR 178 ("...***can work only 1/3 of the day***.") (emph. added).  Moreover, Ms. Hawks provided reports from a Certified Rehabilitation Counselor establishing her ***inability*** to perform her occupation at PNC, as well as ***any occupation*** in the local or national economy.  These opinions, as well as those from her treaters, were ***confirmed*** when the Social Security Administration ("SSA") approved her claim for Social Security disability benefits ("SSDI")—finding Ms. Hawks was unable to perform ***any occupation***.

Despite Ms. Hawks' supporting evidence, Defendants terminated Ms. Hawks' benefits based upon the Claim Administrator's—Lincoln Life Assurance Company of Boston ("Lincoln Life")—decision and failure to adhere to the terms of the Plan and ERISA.  Further, Lincoln Life's decision was based on multiple flawed occupational analyses that ***refused*** to investigate the physical requirements of Ms. Hawks' occupation—relying instead upon an occupational

category that incorrectly labeled Ms. Hawks' position as sedentary. *See* AR 997 ("The physical demands of the job ***are unknown***.") (emph. added). Notably, in a prior case, the Plan argued a similar occupation at PNC—using the same Dictionary of Occupational ("DOT") occupational category—was ***light*** duty and not sedentary. *See Herbert v. PNC Fin. Servs. Grp.*, 2016 U.S. Dist. LEXIS 15133, at *29 (E.D.Pa. Feb. 8, 2016) ("Michuda's report established that Herbert's role as a ***Branch Manager*** required sedentary and ***light physical demands***.") (emph. added).

Based on the foregoing, and as discussed more herein, Ms. Hawks requests the Court enter judgment in her favor.

### Statement of Facts

Consistent with Local Rules, Ms. Hawks has simultaneously filed herewith her response to Defendants' statement of material facts. Further, Ms. Hawks has already provided the Court with her own statement of material facts. *See* Dkt 44. As such, Ms. Hawks incorporates both as though fully set forth herein.

### Standard of Review

"The Supreme Court has held that 'a denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

Defendants ***bear the burden*** of proving the standard of review has been altered from *de novo*. *Id.* ("The plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies.") (quoting *Kinstler v. First Reliance Std. Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999)). To meet its burden Defendants must prove the Plan provided it discretionary authority, it was permitted to delegate its discretion, and the discretion was

exercised by a party authorized to do so. *See Lucas v. Liberty Life Assur. Co.*, 2014 U.S. Dist. LEXIS 184860, *21 (E.D.Pa. Mar. 28, 2014) ("Liberty Life has the burden of demonstrating that it was the party that actually made the decision…").  Here, the Claims Administrator was "Lincoln Financial Group." *See* AR 104.  However, the entity that made the decision was "Lincoln Life Assurance Company of Boston." *See* AR 495.

Here, aside from the statements of its counsel, which is ***not*** evidence[1], Defendants have produced **no evidence** showing the influence and control Lincoln Financial Group has over the employees of Lincoln Life.

> Other courts that have had to decide what entity made the benefit determination have looked to factors such as what entity had influence over the benefit decision process, what entity employed, supervised, and controlled the individual who made the benefits determination, what entity sent correspondence regarding the benefit determination to the claimant, and what entity the claimant was directed to contact to appeal the benefits determination.

*Id*. at *21-22.  Absent such information, Lincoln Life has failed to meet its burden of proof. Notably, the ASA Defendants rely upon identifies "Liberty Life Assurance Company of Boston" as the entity with discretion—***not*** Lincoln Financial or Lincoln Life. *See* AR 1480-1481.

However, if the arbitrary and capricious standard applies, the Court can overturn the Plan's decision if it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *See Miller v. Am. Airlines, Inc*., 632 F.3d 837, 845 (3d Cir. 2011).  Further, the Court reviews "procedural factors underlying the administrator's decision-making process, as well as structural concerns regarding how the particular ERISA plan was funded, to determine if the conclusion was arbitrary and capricious." *Id*.

---

[1]    *Faustov v. AG of United States*, 610 F. App'x 179, 185 (3d Cir. 2015) ("…statements of counsel do not constitute evidence.").

**Discussion**

Ms. Hawks has filed her competing motion for summary judgment that discusses the evidence in the Administrative Record, as well as the issues with the decision to terminate her LTD benefits. *See* Dkt 43. In further support of her position and in opposition to Defendants' motion for summary judgment, Ms. Hawks offers the following.[2]

**A.**     **The termination of Ms. Hawks' LTD benefits was arbitrary and capricious.**

To pass muster, the decisions on Ms. Hawks' LTD benefits were ***required*** to be supported by "***substantial*** evidence." *See Miller*, 632 F.3d at 845 (emph. added). However, neither the termination of her benefits nor the appeal denial satisfy this requirement.

**1.**     **The termination of Ms. Hawks' LTD benefits was *not* well supported and reasoned.**

The only evidence Lincoln Life relied upon in terminating Ms. Hawks' LTD benefits was the opinion of an unnamed record reviewer and an occupational analysis. *See infra*. Neither of these pieces of evidence provide Lincoln Life the necessary substantial evidence to terminate Ms. Hawks' LTD benefits—especially when reviewed in conjunction with the opinions of Ms. Hawks' treating physicians and her award of SSDI benefits.

**a.**     **Ms. Hawks' evidence did support her Disability.**

At the time Ms. Hawks' LTD benefits were terminated—and following on appeal (*see infra*)—her treating physicians ***supported*** her claim for continued Disability benefits. Moreover, the diagnostic imaging showed Ms. Hawks continued to suffer from chronic pain—impacting her ability to perform full-time level work at ***any*** strength level.

***First***, the CT scan of her right ankle from April 19, 2019, showed Ms. Hawks continued

---

[2]     For ease of reference, the following headings and sections are intended to follow with the argument contained in Defendants' motion for summary judgment.

to have issues and provided support for her ongoing pain—inhibiting her ability to work.

Specifically, the CT scan provided the following findings:

> …Although **there is a persistent fracture plane evident along the anterolateral edge of the previous medial malleolus fracture fragment,** there appears to be **substantial osseous bridging** posterior and lateral to the retrograde screw to the medial plate. The distal fibular fracture appears solidly healed but **there is some demineralization in the distal fibula as seen previously**.
>
> The bones around the foot and ankle appear diffusely demineralized.
>
> …**There are two small intra-articular bone fragments at the tibiotalar joint, around the periphery of that joint**. These may be synovialized to those positions and not frankly "loose". The flexor and extensor tendons are intact.

*See* AR 1079 (emph. added). Based on his review of the CT scan, Dr. Lewis opined future surgery should be considered. *See* AR 1069 ("We discussed that we could consider one final surgery…"). Moreover, despite some healing, Dr. Lewis confirmed Ms. Hawks "will always have persistent pain and stiffness" and would likely have future issues. *See* AR 1066.

**Second**, contrary to Lincoln Life's termination letter, Dr. Lewis did **not** release Ms. Hawks to return to work. Rather, Dr. Lewis' "Restrictions Form" provided the following:

- Diagnoses: "Right ankle displaced trimalleolar fracture."

- **No strength level** was identified for "full-time" work Ms. Hawks could perform.

- "Activities as tolerated."

- When asked what treatment and findings support her restrictions and inability to return to work—stating "see records"

*See* AR 485-486. Had Dr. Lewis believed Ms. Hawks could return to work, he would have indicated a strength level he believed she could perform on a full-time basis—**he did not**. Rather, his November 2019 opinion was consistent with his prior opinions—Ms. Hawks was and

remained **unable to perform full-time work** at any strength level. *See e.g.,* AR 485, 955, 1176.

The medical records **confirm** Dr. Lewis' opinion—that Ms. Hawks would always have persistent

pain and be unable to work full-time.

> However, her ankle will certainly never be the same as result of this
> Injury. **She will always have persistent pain and stiffness**. She has applied
> for permanent disability as **she cannot return to her preinjury job status**.
>
> She also has a much **higher risk of developing significant post traumatic
> arthritis as a result of this injury**. Given her relatively young age, I would
> expect her to have greater than **50% chance of eventually requiring a
> definitive procedure such as ankle arthrodesis or arthroplasty**. Any such
> procedure would also be directly result of her original fracture/injury.

*See* AR 1066 (emph. added).

   **Third**,  again contrary to Lincoln Life's termination letter, Dr. Anderson's November 27,

2019 "Restrictions Form" did **not** support the termination of Ms. Hawks' benefits.  Rather, Dr.

Anderson's "Restrictions Form" provided the following opinions:

- Diagnoses: "Type 2 Diabetes Mellitus", "Hypertension", "Closed
  trimalleolar fractured right ankle."

- "Unable to stand/walk any substantial length of time"

- Under restrictions he noted they were continuing to present due to
  "Disability"

- Her restrictions were supported by "rt ankle fracture and TTP."

- When asked what treatment supports her inability to return to work, he
  stated: "specialty follow-up.  Unclear long term prognosis."

*See* AR 544-545.  While Dr. Anderson did check the box for "sedentary" level work, it is worth

noting this was the **lowest** option provided—Lincoln Life's form does **not** include a selection of

"none."  Moreover, Ms. Hawks' occupation was classified as **light duty**—not sedentary. *See*

*infra*.  Defendants confirmed this fact in prior litigation. *See Herbert*, 2016 U.S. Dist. LEXIS

15133, at *29 ("Michuda's report established that Herbert's role as a **Branch Manager** required

sedentary and ***light physical demands***.") (emph. added). Finally, to the extent there was any question, Dr. Anderson confirmed his support for Ms. Hawks in his August 2020 opinion—restricting her to working "1/3 of a day." *See infra*.

Therefore, the evidence from Ms. Hawks' treaters ***supported*** her continuing to satisfy the Plan's definition of Disability—entitling her to ongoing benefits.

### b. Lincoln Life's reliance on a record review was flawed.

According to the termination letter, Lincoln Life's medical reviewer found Ms. Hawks could only "stand or walk at a modest pace continuously for brief periods of less than 15 minutes at a time." *See* AR 496. The reviewer made ***no comment*** on how long Ms. Hawks could stand/walk over the course of a full-time 8-hour workday. *Id.* This is relevant given, even if Ms. Hawks' occupation was defined as "sedentary", the record reviewer did ***not*** provide an opinion that Ms. Hawks could walk or stand occasionally throughout the workday (i.e., up to 1/3 of the time). Conversely, Ms. Hawks' treater—Dr. Lewis—confirmed she was ***unable to perform any occupational strength level*** on a full-time basis. *See supra*.

### c. Lincoln Life's reliance on the occupational analysis was flawed.

Aside from its record review, the only evidence Lincoln Life identified in the termination letter was an "Occupational Analysis." *See* AR 495-497. Despite Defendants' contention, the occupational analysis did ***not*** support the decision and was not "thorough." *See* Dkt 39, p.12. Rather, the occupational analysis was flawed for a number of reasons.

### i. The occupational analysis *failed* to conduct an investigation into the physical demands of Ms. Hawks' occupation.

As her report readily admits, Michelle Reddinger did ***not*** investigate the physical demands of Ms. Hawks' occupation. *See* AR 997 ("<u>Job Physical Demands</u>: Unknown… The physical demands of the job are unknown."). Had she done so, the occupational analysis would

have confirmed Ms. Hawks' occupation was categorized as ***"light" duty*** and ***not "sedentary."***[3] Instead, Ms. Reddinger relied upon the ***general*** occupational category title of "Manager, Financial Institution" to support Ms. Hawks' occupation being defined as "sedentary." *Id*. Notably, this general occupational category contains ***multiple*** occupational titles and are ***not specific to Ms. Hawks' occupation with PNC***. *See infra*. The following chart exemplifies this fact—not just for Lincoln Life's termination but also the occupations it identified on appeal.

| DOT Code | Occupational Category Title | O*Net Code[4] | Occupation Titles[5] |
|---|---|---|---|
| 186.167-086 | Manager, Financial Institution | 11-3031.00 | 12 |
| 169.167-038 | Order Department Supervisor | 41-1012.00 | 8 |
| 241.137-014 | Supervisor, Customer Complaint | 43-1011.00 | 11 |
| 186.267-018 | Loan Officer | 13-2072.00 | 7 |

Notably, the need to investigate Ms. Hawks' actual occupation—and the fact it is performed at light level—is ***confirmed*** in prior cases against Defendants concerning the same occupational category "Manager, Financial Institution" for a PNC Bank Manager.

> On January 28, 2013, Melissa Michuda ("Michuda"), Liberty's Vocational Rehabilitation Case Manager, provided her Occupational Analysis concerning the physical demands of ***Herbert's role as Branch Manager II*** as performed in the national economy…
>
> Michuda established that ***Herbert's occupation is most comparable to "Manager, Financial Institution" as defined by DOT***…According to Michuda, the DOT states that this occupation is performed at the "sedentary" physical demand level with some positional requirements, such as "reaching and handling."…Michuda also surveyed the "Occupational Outlook Handbook" and the "Occupational Information Network" before concluding that "the occupation of Manager, Financial Institution is typically performed at the sedentary and ***light physical demand levels***."…Based on this, Michuda concluded that Herbert's job was "***performed at the sedentary to light physical demand categories within the national economy***."

---

[3]   *See infra*; *see also* AR 336 ("…this occupation would be considered Light Work…").
[4]   These codes came from the O*Net crosswalk. *See* https://www.onetonline.org/crosswalk/
[5]   *See* https://www.bls.gov/soc/2018/soc_2018_direct_match_title_file.pdf

*Herbert*, 2016 U.S. Dist. LEXIS 15133, at *17-19 (emph. added).

Despite the above, in its motion, Defendants want to avoid this discussion and instead contend that "when 'own occupation' is defined by how the occupation is performed in the national economy, it is reasonable to utilize and rely on the DOT job description." *See* Dkt 39, p.12. However, while they may ***consider*** the DOT job description, Defendants cannot ***ignore*** the ***actual*** requirements of an insured's occupation.

> Liberty Life ***acted arbitrarily and capriciously*** when it relied upon its vocational analysts' reports that ***did not consider the plaintiff's actual job requirements*** when determining the duties of his occupation in the national economy.

*Van Arsdel v. Liberty Life Assurance Co.*, 267 F.Supp.3d 538, 576 (E.D.Pa.2017) (emph. added).

> Moreover, this Court takes issue with the manner in which Liberty Life so readily disregarded Plaintiff's actual job duties when determining whether Plaintiff was able to perform her "Own Occupation."
> …
> As it did in *Kavanay*, ***Liberty Life conflated Plaintiff's actual job duties*** requiring her to travel from site to site ***with a job description that better suited its conclusion that Plaintiff's work was sedentary***. This Court agrees with the *Kavanay* court's reasoning and its holding that such an analysis under the "Own Occupation" language of Liberty Life's policy ***"amounts to an abuse of discretion and cannot stand."***

*Branca v. Liberty Life Assurance Co.*, 2014 U.S. Dist. LEXIS 46682, at *43-45 (E.D. Pa. Apr. 3, 2014) (citing *Kavanay v. Liberty Life Assurance Company of Boston*, 914 F.Supp.2d 832 (S.D.Miss. 2012) (emph. added).[6]

> Though her precise duties do not define her regular occupation, in this case they well illustrate the duties of a director of nursing at a small health

---

[6]  In both *Van Arsdel* and *Branca*, the courts were reviewing disability policies with similar definitions to Ms. Hawks'. *See Van Arsdel*, 267 F.Supp.3d at 575 ("For purposes of determining disability under this policy, Liberty [Life] will consider the Covered Person's occupation as it is ***normally performed in the national economy***.") (emph. added); *Branca*, 2014 U.S. Dist. LEXIS 46682, at *3 (same).  Notably, these Liberty cases are inherently relevant here given Lincoln bought out Liberty and took over this particular book of business—apparently maintaining the same problematic claim administration processes.

care facility, and nothing in the record provides any basis for thinking that such a position at a facility comparable to hers requires different duties.

*Burch v. Hartford Life & Accident Ins. Co*., 314 F.App'x 750, 755 (5th Cir. 2009) (citing

*Kinstler v. First Reliance Standard Life Ins. Co*., 181 F.3d 243 (2d Cir. 1999)) (emph. added);

*see also Card v. Principal Life Ins. Co*., 790 F.App'x 730, 742 (6th Cir. 2019).

Notably, the cases Defendants rely upon are easily distinguishable. Specifically, neither

*Hilbert*[7] nor *Nyman*[8] held Lincoln Life could ***ignore*** Ms. Hawks' actual job duties. Rather, both

only held the insurer could ***consider*** the DOT "***in addition to***" the insured's actual job duties.

> Accordingly, because Lincoln's LTD Policy explicitly defines "Own Occupation" by referring to how the occupation is performed in the national economy, it was appropriate for Lincoln to include in its consideration the DOT job description ***in addition to the description obtained from Delta Dental***.

*Hilbert*, 2017 U.S. Dist. LEXIS 93424, at *25-26 (emph. added).

> …was appropriate for Liberty Life to include in its consideration the DOT job description***, in addition to the description obtained from Coca-Cola***.

*Nyman,* 2005 U.S. Dist. LEXIS 33542, at *39 (emph. added).

The majority of courts in the Third Circuit, as well as those throughout the country,

confirm the requirement to ***consider*** and ***investigate*** an insured's ***actual job duties***. *See supra*.

This requirement is necessary given an occupation identified in the DOT and O*Net—both

utilized by Lincoln Life—is ***not*** specific but corresponds to a ***category*** of occupations.[9]

> It points out that the DOT contains no separate listing for an orthopedic surgeon, which appears as an undefined related title under the "surgeon" heading. Therefore, applying the definition of surgeon, which does not refer to on-call and emergency duties, Reliance argues that these duties are

---

[7]  *Hilbert v. Lincoln Nat'l Life Ins. Co*., 2017 U.S. Dist. LEXIS 93424 (M.D.Pa. June 19, 2017).
[8]  *Nyman v. Liberty Mut. Assurance Co*., 2005 U.S. Dist. LEXIS 33542 (M.D.Pa. Sep. 7, 2005).
[9]  *See* https://www.bls.gov/soc/2018/major_groups.htm#11-0000 ("11-3031 Financial Managers…***examples***: Bank Branch Manager, Comptroller, Financial Director") (emph. added); *see also supra* (chart on number of occupational titles under the occupational category title).

- 10 -

immaterial. ***We agree with the District Court that the DOT's silence about this critical issue makes the DOT unhelpful and thus***, to the extent that Reliance's conclusion is based on the DOT's definition of surgeon, ***that conclusion is unreasonable***.

*Lasser v. Reliance Standard Life Ins. Co*., 344 F.3d 381, 387 n.5 (3d Cir. 2003) (emph. added).

While Defendants' want to fault Ms. Hawks for leaving a section blank in her "Training-Education-Experience Form" (*see* Dkt 39, p.13), the fact remains Ms. Reddinger ***never*** contacted Ms. Hawks to address this issue or to obtain additional necessary information.  *See* AR 997 ("I have not met with Ms. Hawks for purpose of this review.").  Again, this is consistent with Ms. Reddinger's failure to conduct the necessary investigation into the physical demands of Ms. Hawks' occupation.  Moreover, this issue was ***not*** raised in Lincoln Life's termination letter— making it *post hoc* and ***not*** properly before the Court. *See* AR 495-497; *see also infra*.

Therefore, Lincoln Life's failure to conduct the appropriate investigation into the physical demands of Ms. Hawks' occupation supports finding the decision to terminate Ms. Hawks' benefits was arbitrary and capricious.

> **ii.     The occupational analysis failed to consider *all* of Ms. Hawks' medical information.**

Next, Ms. Reddinger's occupational analysis relied ***exclusively*** on the restrictions from Lincoln Life's in-house medical nurse—there was no discussion of Ms. Hawks' treaters. *See* AR 996 ("RESTRICTIONS/LIMITATIONS: The 8/6/19 nursing memo notes the following…"). There is no evidence Ms. Reddinger was provided or considered the opinions of Ms. Hawks' treaters—meaning the occupational analysis ***cannot*** be considered substantial evidence.

> A vocational expert's opinion that a claimant can perform certain jobs is only substantial evidence to the extent that the vocational expert had a complete, accurate understanding of the claimant's restrictions...

*Neaton v. Hartford Life & Acc. Ins. Co.*, 517 F.App'x 475, 485 (6th Cir. 2013).

iii.    **The occupational analysis did *not* consider *all* physical demands.**

Lastly, Ms. Reddinger's occupational analysis only looked at certain physical demands of the occupational category for "Manager, Financial Institution."  Specifically, Ms. Reddinger only pointed to the following physical demands: (i) frequent reaching, handling, sitting, and fingering; and (ii) occasional standing and walking. *See* AR 997.  However, these are ***not*** the only physical demands of the occupation.

O*Net[10] provides "Standardized Scores" that identify the importance of certain "physical work conditions" for occupations.[11]  Relevant here, the O*Net provides scores for sitting, standing, walking, climbing, crawling, and balancing. *Id*.  The following chart provides the scores for the occupation identified in Lincoln Life's original termination and the occupations it identified on appeal—those on appeal or discussed more below (*see infra*).

| Occupation | Code | Sit[12] | Stand | Walk | Climb | Crawl | Balance |
|---|---|---|---|---|---|---|---|
| Manager, Fin. Inst. | 11-3031.00 | 79 | 23 | 18 | 4 | 4 | 3 |
| Order Dept. Supvr. | 41-1012.00 | 68 | 37 | 39 | 9 | 22 | 9 |
| Supvr, Cust. Compl. | 43-1011.00 | 83 | 29 | 17 | 1 | 6 | 3 |
| Loan Officer | 13-2072.00 | 90 | 29 | 19 | 0 | 1 | 4 |

Based on O*Net, each occupation identified throughout the claim and appeals process requires at least some climbing, crawling and/or balancing—all things Lincoln Life itself

---

[10]    O*Net provides more up-to-date information given the Dictionary of Occupational Titles ("DOT") is vastly outdated.  By way of example, "Manager, Financial Institution" was last updated ***in 1988***—making its relevancy questionable. *See* AR 998; *Prado v. Allied Domecq Spirits & Wine Grp. Disability Income Policy*, 2008 U.S. Dist. LEXIS 4295, at *24 (N.D.Cal. Jan. 22, 2008) ("The DOT's relevance to the present case is questionable for other reasons as well. According to Liberty's own Vocational Case Manager, the description for Plaintiff's occupation in the DOT was last updated in 1977, ***making its relevancy today questionable***.").
[11]    *See* https://www.onetonline.org/find/descriptor/browse/Work_Context/4.C.2/; https://www.onetonline.org/help/online/scales#score.
[12]    *See* https://www.onetonline.org/find/descriptor/browse/Work_Context/4.C.2/ —selecting the relevant categories for each physical work conditions and searching for the specific code.

confirmed Ms. Hawks is ***unable to do***. *See e.g.* AR 233 ("The claimant can ***never*** crawl, balance, climb ladders/poles, etc.). As such, Ms. Hawks ***could not*** perform any of the occupational titles under "Manager, Financial Institution"—let alone any of those identified on appeal. *See infra*.

### d. Additional flaws in Lincoln Life's termination decision.

In addition to its failure to support its decision with substantial evidence, Lincoln Life's termination letter also failed to adhere to the Plan's and ERISA's requirements.

### i. Lincoln Life *ignored* Ms. Hawks' treating physicians.

Under both ERISA and the Plan, Lincoln Life was ***required*** to explain why it disagreed with Ms. Hawks' treating physicians.

> If your claim is denied, the notice of denial will include… discussion of the decision, including an explanation for disagreeing with or not following: [i] the views presented by you of health care professionals treating you and vocational professionals who evaluated you…

AR 98; *see also* 29 CFR 2560.503-1(g)(1)(vii)(A)(i). However, in terminating her benefits, Lincoln Life did ***not*** comply with this requirement. Rather, the termination letter's only discussion of Dr. Lewis was:

> Dr. Lewis indicated on November 12, 2019 that you can perform activities as tolerated on a restrictions form and in medical records noted you would always have some pain and stiffness of the right ankle.

AR 496. This ***ignores*** the entirety of Dr. Lewis' November 12, 2019 Restrictions Form—again he did ***not*** identify ***any*** strength level Ms. Hawks could perform full-time. AR 485.

### ii. Lincoln Life *failed* to identify what information was needed to perfect Ms. Hawks' claim.

Under both ERISA and the Plan, in its termination letter, Lincoln Life was ***required*** to describe "any additional material of information necessary…to perfect the claim and an explanation of why such material or information is necessary." *See* AR 98; 29 CFR 2560.503-1(g)(1)(iii). However, in its termination letter to Ms. Hawks, Lincoln Life was ***silent*** as to what

additional information Ms. Hawks needed to provide.  Rather, Lincoln Life simply said it could change its mind based "on any additional information that may be submitted" (*See* AR 496)—this is insufficient and supports finding the decision was arbitrary and capricious.

> Given that ***the letter did not set forth any additional instruction as to how Miller could achieve a favorable disability determination***, it does not comply with 29 C.F.R. § 2560.503-1(g)(1)(iii). The termination letter here does not satisfy the basic procedural mandates of ERISA, as set forth in § 503 and the relevant regulations….For that reason, ***American's noncompliance with the statute weighs in favor of finding that their decision was arbitrary and capricious***.

*Miller*, 632 F.3d at 852-53 (emph added).  This is even more relevant where Defendants—for the first time—are trying make an issue about what information Ms. Hawks provided.[13]

### iii.  Lincoln Life *failed* to explain its disagreement with Social Security.

Under both ERISA and the Plan, Lincoln Life was ***required*** to explain why it disagreed with a decision from the SSA.

> If your claim is denied, the notice of denial will include… discussion of the decision, including an explanation for disagreeing with or not following: …[iii] a disability determination provided by you to the Plan made by the Social Security Administration…

AR 98; *see also* 29 CFR 2560.503-1(g)(1)(vii)(A)(iii).  However, in terminating Ms. Hawks' benefits the termination letter ***failed to even mention the SSA***.  *See* AR 495-497.  Rather, Lincoln Life was ***silent*** on the issue—despite being aware that Ms. Hawks had been approved for SSDI benefits and even requesting she reimburse it for an overpayment. *Id*.; *see also* AR 47.

> The fact that the SSA found Plaintiff disabled under this much narrower definition and Liberty Life's failure to consider that fact in finding that Plaintiff was not disabled under its own broader definition gives this Court pause and must be "considered as a factor in determining whether an ERISA administrator's decision to deny benefits was arbitrary and

---

[13]  *See* Dkt 39, p.13 ("…Plaintiff left the section for tasks/duties for her job…blank"); p.16 ("Plaintiff's appeal failed to submit any medical records showing any treatment that postdated Dr. Fakunle's January 8, 2020 normal exam.").

capricious[.]"

*Branca*, 2014 U.S. Dist. LEXIS 46682, at *36 (citing *Brandeburg v. Corning Inc. Pension Plan for Hourly Emples*., 243 F. App'x 671, n.3 (3d Cir. 2007)).

The failure to consider Ms. Hawks' award of SSDI benefits at the termination stage supports finding the decision to terminate Ms. Hawks' benefits was arbitrary and capricious. This is especially true given Ms. Hawks was awarded SSDI benefits ***on application*** (i.e., the claim level)—something that is "not easily won."[14]

### 2. The appeal decision was neither reasonable nor correct.

Next, Defendants' argument turns to Lincoln Life's actions on appeal—contending the appeal decision was not arbitrary and capricious. *See* Dkt 39, p.14. However, like the termination of her benefits, the appeal decision was neither reasonable nor correct.

### a. Ms. Hawks provided additional medical and vocational evidence to support her continued disability.

Contrary to Defendants' arguments, Ms. Hawks ***did provide*** additional evidence in support of her appeal. Specifically, Ms. Hawks provided an "Employability and Earning Capacity Evaluation" from a Certified Rehabilitation Counselor and Diplomate of the American Board of Vocational Experts—Mr. Provder. Mr. Provder provided an ***in-depth*** analysis and explanation of his methods, practices, and how he reached his conclusions. *See* AR 327-350.

In sum, Mr. Provder provided the following relevant opinions:

- Ms. Hawks' occupation at PNC would "be considered Sedentary to Light Work as ***she spent most of her time standing and walking***…She had to attend meetings for the bank and with clients."

- "The results of the vocational evaluation indicate that Ms. Hawks' vocational capacity is so compromised ***she cannot perform work***

---

[14] *Weinberger v. Reliance Standard Life Ins. Co*., 54 F. App'x 553, 558 (3d Cir. 2002) (Judge Fullam, Concurring) ("Persons familiar with Social Security disability litigation are certainly aware that the award of disability benefits at the administrative level is not easily won.").

*requiring Sedentary Physical demands on a sustained basis*."

- "Given Ms. Hawks' severe limitations and reduced vocational capacity, **she is precluded from accessing the labor market**."

*Id.* (emph. added).

While Defendants' contend Mr. Provder did not have the "updated medical records from November 2019", those would ***not*** impact his decision.[15] Again, Dr. Lewis did ***not*** release Ms. Hawks to full-time work and Dr. Anderson did ***not*** release Ms. Hawks to work "light" duty work. Moreover, Defendants' arguments regarding what additional medical records Ms. Hawks did not provide is specious at best given Lincoln Life ***never*** requested this information or identified the need for it. *See supra*.

### b. Lincoln Life's reliance on record reviews was flawed.

On appeal, Lincoln Life relied ***solely*** on record reviews. Even though, under the terms of the Plan, Lincoln Life could have Ms. Hawks examined. *See* AR 94-95; *see also* AR 1482 ("[Lincoln] may investigate any claim and/or request that the claimant be examined at any point during the life of the claim."). While there is no requirement for Lincoln Life to have Ms. Hawks examined, the failure to do so weighs in favor of finding a decision arbitrary and capricious—especially where her treater supports her disability.

> *The absence of an examination is a factor in analyzing the differences in the opinions of the consultant and the treating physician*. There is no obligation on the insurer to have an insured examined by a physician. However, where the insured's treating physician's disability opinion is unequivocal and based on a long term physician-patient relationship, *reliance on a non-examining physician's opinion premised on a records review alone is suspect and suggests that the insurer is looking for a reason to deny benefits*.

---

[15]  If Defendants' argument is accepted, then the same would hold true for Ms. Reddinger whose report was prepared in August 2019—three months ***before*** the November 2019 opinions from Dr. Lewis and Dr. Anderson. *See* AR 996.

*Morgan v. Prudential Ins. Co. of Am.*, 755 F.Supp.2d 639, 647 (E.D.Pa. 2010) (emph. added).[16]

> If Hartford had made its termination decision without asking Minutello to undergo a physical examination or a functional capacity evaluation, its failure to "objectively measure her physical abilities" would have constituted a ground for setting that decision aside.

*Minutello v. Hartford Life & Accident Ins. Co*., 964 F.Supp.2d 491, 510 (W.D.Pa. 2013).

In this case, Ms. Hawks specifically requested Lincoln Life have her undergo a physical examination. *See* AR 303 ("We also urge Lincoln to have a physician examine Rhonda…"). However, Lincoln Life refused to have Ms. Hawks examined—relying instead on two record reviews. Notably, a physical examination—and Lincoln Life's failure to obtain one—is all the more relevant where, as here, the disabling condition revolves around chronic pain, which is inherently subjective.

> The court determined that ***the plan's decision to terminate the plaintiff's benefits was arbitrary and capricious***, in part, because of its failure to conduct an IME and due to its reliance on ***a paper review that discounted and ignored documented reports of pain***.

*Moustafa v. ReliaStar Life Ins. Co*., 2016 U.S. Dist. LEXIS 155257, at *21-22 (D.N.J. Nov. 8, 2016) (emph. added); *Gessling v. Grp. Long Term Disability Plan for Emples. of Sprint/United Mgmt. Co.*, 693 F.Supp.2d 856, 866 (S.D.Ind. 2010) ("…a mere record review is not sufficient to provide a reasonable basis for discounting…accounts of his pain and resulting limitations.").

> …the failure to procure such an examination may be unreasonable where the specific impairments or limitations at issue are not amenable to consideration by means of a file review.

*Songer v. Reliance Standard Life Ins. Co*., 106 F.Supp.3d 664, 675 (W.D.Pa. 2015).

Further, the opinions from Drs. Broomes and Green both confirm Ms. Hawks would be

---

[16]  *See also Levine v. Life Ins. Co. of N. Am*., 2016 U.S. Dist. LEXIS 53286, *25-26 (E.D.Pa. Apr. 21, 2016); *Haisley v. Sedgwick Claims Mgmt. Servs., Inc.*, 776 F. Supp. 2d 33, 49 (W.D.Pa. 2011) ( "the failure to procure such an examination may be unreasonable where the specific impairments or limitations at issue are not amenable to consideration by means of a file review").

unable to perform the physical requirements of both her occupation and the other occupations Lincoln Life identified on appeal. *See* AR 223 ("Climbing – never"); AR 231 ("The claimant can never crawl, balance, climb ladders/poles, work at heights or operate heavy machinery."); *see also infra*. Therefore, Lincoln Life's reliance on these reports supports finding the decision to terminate Ms. Hawks' benefits was arbitrary and capricious.

### c.     Lincoln Life's reliance on the occupational analysis was flawed.

Next, Defendants point to a second occupational analysis Lincoln Life obtained on appeal from Lori Ashworth. *See* Dkt 44, p.19. However, Ms. Ashworth's opinion suffers from the **same flaws** as Ms. Reddinger's.

**First**, Ms. Ashworth did **not** investigate what the physical demands of Ms. Hawks' occupation were—the appeal denial letter confirms this fact. *See* AR 149 ("The physical demands of the job are unknown."). Rather, Ms. Ashworth again utilized **general** occupational category titles—each of which had multiple occupational titles that fell within them. *See supra*.

| DOT Code | Occupational Category Title | O*Net Code | Occupation Titles |
|---|---|---|---|
| 186.167-086 | Manager, Financial Institution | 11-3031.00 | 12 |
| 169.167-038 | Order Department Supervisor | 41-1012.00 | 8 |
| 241.137-014 | Supervisor, Customer Complaint | 43-1011.00 | 11 |
| 186.267-018 | Loan Officer | 13-2072.00 | 7 |

**Second**, Ms. Ashworth's restrictions and limitations came exclusively from a record reviewer—Dr. Arlen Green. *See* AR 233. Ms. Ashworth was not provided and did **not** discuss any of the opinions from Ms. Hawks' treating physicians.

**Third**, Ms. Ashworth again did not consider **all** the physical demands for the occupational categories identified. Again, according to O*Net, each occupation identified requires at least some climbing, crawling, and/or balancing—all things Lincoln Life itself confirmed Ms. Hawks is **unable to do**. *See* AR 233 ("claimant can **never** crawl, balance, climb").

| Occupation | Code | Sit[17] | Stand | Walk | Climb | Crawl | Balance |
|---|---|---|---|---|---|---|---|
| Manager, Fin. Inst. | 11-3031.00 | 79 | 23 | 18 | 4 | 4 | 3 |
| Order Dept. Supvr. | 41-1012.00 | 68 | 37 | 39 | 9 | 22 | 9 |
| Supvr, Cust. Compl. | 43-1011.00 | 83 | 29 | 17 | 1 | 6 | 3 |
| Loan Officer | 13-2072.00 | 90 | 29 | 19 | 0 | 1 | 4 |

Therefore, the occupational analysis from Ms. Ashworth is ***not*** substantial evidence.

### d. Ms. Hawks' supplemental evidence *supports* her Disability.

Following Lincoln Life providing her the opinions of Drs. Broomes and Green, as well as the occupational analysis from Ms. Ashworth, Ms. Hawks provided Lincoln Life with supplemental information that ***further supported*** her inability to perform full-time work.

***First***, Ms. Hawks obtained a second "Employability and Earning Capacity Evaluation" from Mr. Provder. Mr. Provder was asked to answer several questions

> 2. ***Could she return to her prior work as a Bank Manager*** and perform the full range of required work activities?
> …
> 6. Does Ms. Hawks meet the definition of "Disabled" as defined ***under the Lincoln Financial Group Long Term Disability Insurance Policy***?

*See* AR 171 (emph. added). Similar to his prior report, Mr. Provder provided an in-depth analysis that detailed his methods and practices—providing the following opinions:

- Ms. Hawks' occupation at PNC would "***be considered Light Work*** as she spent more time standing and walking. At times, she would have to lift and carry boxes of coins which weighed up to 20 pounds…She had to attend meetings for the bank and with clients."

- "…***she cannot perform work requiring Sedentary Physical demands on a sustained basis***."

- "It is my opinion, as a vocational expert, that ***Ms. Hawks is unable to perform the job duties of her prior occupation as a Bank Manager and 'is unable to perform the material duties of any occupation*** for which she can become qualified to perform by education, training or experience' ***in the local or national economy***."

---

[17] *See* https://www.onetonline.org/find/descriptor/browse/Work_Context/4.C.2/ —selecting the relevant categories for each physical work conditions and searching for the specific code.

*See* AR 180, 188-193 (emph. added).  These opinions are unequivocal—Ms. Hawks ***cannot perform her light duty occupation*** and ***cannot perform any occupation in the national economy*** for which she is or can become qualified to perform.

While Lincoln Life obtained an addendum from Jason Miller to Ms. Ashworth's occupation analysis from, this does not obviate Mr. Provder's opinions.  Rather, Mr. Miller still performed ***no investigation*** into Ms. Hawks' occupation at PNC.  *See* AR 149 ("The physical demands of the job are unknown.").  Further, Mr. Miller's opinion is even more questionable given the Plan previously found the occupational category of "Manager, Financial Institution" for a Branch Manager—utilized here—and found it required "sedentary and light physical demand levels." *See Herbert*, 2016 U.S. Dist. LEXIS 15133, at *29 ("…Branch Manager required sedentary and light physical demands").

***Second***, as noted in Mr. Provder's report, Dr. Anderson provided a "Physical Capacity Evaluation" that provides the following restrictions for Ms. Hawks:

> Dr. Ian Anderson (8/20/20) on Physical Capacity Evaluation States: "Sit 1-3 hours, Stand 0 hour, Walk 0 hours, Occasionally Climb Stairs, Lift 10 pounds Occasionally, and ***can work only 1/3 of the day***.'"

*See* AR 178 (emph. added); *see also* Dkt 44-1, pp.84-85.  As such, Dr. Anderson ***supported*** Ms. Hawks' continued inability to perform not just her occupation, but ***any*** occupation on a full-time basis—a finding that she is Disabled.

Again, the persons who physically examined Ms. Hawks, met with her, and considered ***all available*** information, conclusively held she was unable to perform her occupation at PNC or ***any*** occupation in the national economy.

### e.    Lincoln Life's appeal denial was fatally flawed.

Contrary to Defendants' argument, Lincoln Life did ***not*** reasonably uphold its decision to

terminate benefits.  Rather, as with Lincoln Life's termination decision, the appeal denial was

fatally flawed—ignoring both the Plan terms and ERISA's claim regulations.

*First*, Lincoln Life was ***required*** to explain why it disagreed with Ms. Hawks' treaters.

*See* 29 CFR 2560.503-1(j)(6)(i)(A).  As with its termination letter, Lincoln Life did ***not*** satisfy

this requirement.  Rather, in the November 12, 2020 appeal denial, there was no discussion of

Dr. Lewis' opinions concerning Ms. Hawks. *See* AR 147-156.  Moreover, despite recognizing

Dr. Anderson provided an additional opinion concerning Ms. Hawks, Lincoln failed to address it

in any manner. *See* AR 153 ("Mr. Provder appears to have relied solely on one physician (Dr.

Anderson) that did not give fulltime work capacity…").

> Dr. Ian Anderson (8/20/20) on Physical Capacity Evaluation States: "Sit
> 1-3 hours, Stand 0 hour, Walk 0 hours, Occasionally Climb Stairs, Lift 10
> pounds Occasionally and can work only 1/3 of the day.

*See* AR 178.[18]  Lincoln Life's letter ***was silent*** as to this opinion.  Further, the appeal denial letter

accepted without question or explanation the occupational analysis addendum from Mr. Miller—

ignoring Mr. Provder's report.

Again, in denying Ms. Hawks' appeal, Lincoln Life failed to explain why it relied upon

"the opinions of non-treating physicians over those of treating physicians", including the

vocational opinions.[19]  This supports finding the termination of Ms. Hawks' benefits was

arbitrary and capricious.

> …***Despite paying lip service to the opinions of plaintiff's treating
> doctors, MetLife's letter breezed past a summary of their opinions***,
> outlined its own consultants' opinions, and concluded with scant analysis
> that plaintiff was capable of working full-time. ***An insurer's unreasoned
> preference for its own consultants' opinions undermines the legitimacy
> of its eligibility determination***.

---

[18]  *See also* Appendix, pp.83-85.
[19]  *Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F.Supp.2d 261, 287 (W.D. Pa. 2008).

*Holmes v. Metro. Life Ins. Co.*, 2011 U.S. Dist. LEXIS 122525, at *31-32 (M.D. Pa. Aug. 12, 2011) (emph. added) (internal citations omitted).

**Second**, Lincoln Life was **required** to explain why it disagreed with the SSA. *See* 29 CFR 2560.503-1(j)(6)(i)(C).  As with its termination letter, Lincoln Life did **not** satisfy this requirement.  Rather, in its appeal denial, Lincoln Life for the **first time** offered an explanation for disagreeing with the SSA decision.  Lincoln Life's inclusion of this **new reason** at the appeals stage is inappropriate violates ERISA.

> Under ERISA, a claimant is entitled to procedural fairness and "full and fair review" of all determinative reasons for the initial denial of benefits claims… "Full and fair" review must provide a claimant with knowledge of the opposing party's contentions and a reasonable opportunity to meet them." …Thus, **"tacking on" an additional basis of denial constitutes a "procedural irregularity" that violates ERISA**.

*Mullica v. Minn. Life Ins. Co*., 2013 U.S. Dist. LEXIS 140271, at *16-17 (E.D. Pa. Sep. 27, 2013) (emph. added); *Bradley v. Liberty Life Assurance Co*., 2016 U.S. Dist. LEXIS 80895, at *27 (D.N.J. June 21, 2016) ("Adding a reason for denying benefits at the appeals stage is inappropriate, as other courts have determined…").

Moreover, Lincoln Life's discussion of the SSA decision is nothing more than a conclusion.  Lincoln Life states it considered "the vocational review and medical reviews by Dr. Stander, Dr. Broomes and Dr. Green that were not considered by the Social Security Administration in its determination process." *See* AR 156.  Lincoln Life's argument is without merit given it did not request or obtain Ms. Hawks' SSDI claim file.  Lincoln Life essentially treated the SSA as irrelevant except for purposes of an overpayment.

> While it is true that a social security award "does not in itself indicate that an administrator's decision was arbitrary and capricious and a plan administrator is not bound by the SSA decision,", **the mere noting of the same and treating it as "essentially irrelevant" is cause for suggesting that unfairness occurred**.

*Porter v. Broadspire*, 492 F.Supp.2d 480, 487 (W.D.Pa. 2007) (citing *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 Fed. Appx. 266 (3d Cir. 2006)) (emph. added).

Lincoln Life's failure to apply the Plan terms and ERISA weighs in favor of finding the termination of benefits being arbitrary and capricious.

**B.    Termination of Ms. Hawks' LTD benefits was *not* correct.**

The last argument Defendants present is, if the *de novo* standard applies, then their decision was correct. However, this ***ignores*** the overwhelming evidence in this case.

As explained, Dr. Lewis ***never*** released Ms. Hawks to return to full-time work—refusing to identify any strength level she could perform on a full-time basis. *See* AR 485. Moreover, while Dr. Anderson indicated Ms. Hawks may be able to perform sedentary level work, that was ***not*** sufficient for Ms. Hawks to perform her light level occupation. *See* AR 180 ("…this occupation would be considered Light Work…"); *Herbert*, 2016 U.S. Dist. LEXIS 15133, at *29. Notably, Dr. Anderson confirmed on appeal that he believed Ms. Hawks was unable to perform ***any occupation***—limiting her to working 1/3 of the workday. *See* AR 179. In addition to her treaters, the SSA confirmed Ms. Hawks' inability to perform not just her own occupation but ***any occupation***—approving her ***application*** for benefits.

Despite these opinions, the Defendants' terminated Ms. Hawks' LTD benefits based upon record reviewers—who never examined Ms. Hawks—and occupational analyses that ***admittedly*** did ***not*** investigate the physical demands of her occupation. *See e.g.* AR 997 ("The physical demands of the job are unknown."). Therefore, under either standard of review, the Defendants' termination of benefits was ***without merit***.

**C.    Remedies.**

To the extent the Court finds in Ms. Hawks' favor, the sole remaining question is what

remedy to award. [20]  As discussed below, Ms. Hawks requests reinstatement of her benefits, interest on past-due benefits—with the parties to separately brief the applicable interest rate, and for leave to separately move for her attorneys' fees and costs.

### 1.      Reinstatement of benefits.

The Court is permitted to reinstate Ms. Hawks' LTD benefits through the date of this order (with interest) or to remand this case to the Plan for it to render a full and fair review. *See Miller*, 632 F.3d 837, 856.  However, the Third Circuit has identified the proper remedy when ERISA benefits were **terminated**—compared to denying benefits at the outset—is to restore the *status quo* (i.e., place the participant back in pay status).

> In deciding whether to remand to the plan administrator or reinstate benefits, we note that it is important to consider the status quo prior to the unlawful denial or termination. … ***In the termination context,*** however, a finding that a decision was arbitrary and capricious means that the administrator terminated the claimant's benefits unlawfully. Accordingly, ***benefits should be reinstated to restore the status quo***.

*Id*. at 856-57 (emph. added).  Here, given the substantial evidence support Ms. Hawks satisfying the Plan's definition of Disability and because she has shown the Plan improperly terminated her LTD benefits—based on both the medical evidence and procedural anomalies—the Court should reinstate her benefits "to restore the status quo." *Id*.

### 2.      Interest.

"Payment for the time-value of money in the form of 'an award of [prejudgment] interest is an equitable remedy enforcing an ERISA plan provision… within the meaning of section 502(a)(3)(B).'" *Zebrowski v. Evonik Degussa Corp. Admin. Comm*., 2012 U.S. Dist. LEXIS 166015, *10 (E.D.Pa. Nov. 20, 2012).  In the Third Circuit "interest is presumptively appropriate

---

[20]   Ms. Hawks already addressed these remedies in her motion for summary judgment. *See* Dkt 43, pp.24-25.  However, they are reiterated herein to avoid any arguments of waiver.

when ERISA benefits have been delayed." *Fotta v. Trs. of the UMW Health & Ret. Fund of 1974*, 165 F.3d 209, 214 (3d Cir. 1998). To the extent the Court finds in her favor, given the space constraints in this brief, Ms. Hawks requests leave to address the applicable rate of prejudgment interest in a separate filing.

### 3.     Attorneys' fees and costs.

If the Court finds in her favor, Ms. Hawks should also be awarded her attorneys' fees and costs in accordance with ERISA § 1132(g)(1) and the Supreme Court's directive in *Hardt v. Reliance Standard Life Ins. Co.,* 560 U.S. 242 (2010). *Hardt* held that an ERISA plan participant is entitled to an award of their fees and costs upon achieving "some degree of success on the merits." *Id*. at 245. Under either an out-right award of benefits or a remand, Ms. Hawks is considered to have achieved "some degree of success on the merits." *See Berkoben v. Aetna Life Ins. Co*., 2014 U.S. Dist. LEXIS 97664, at *20 (W.D. Pa. July 18, 2014). Further, in order to be made whole, Ms. Hawks should be awarded her attorneys' fees and costs in full. *See CIGNA Corp. v. Amara*, 563 U.S. 421, 443-444 (2011).

As above, to the extent the Court finds in her favor, given the space constraints in this brief, Ms. Hawks requests leave to address the applicable factors and detail necessary to support the Court awarding her attorneys' fees and costs.

### Conclusion

Based on the foregoing, Ms. Hawks requests the Court ***deny*** Defendants' motion for summary judgment. Additionally, Ms. Hawks requests the Court ***grant*** her competing motion for summary judgment and enter judgment in her favor with the following relief: (i) past due LTD benefits through the date of the Court's order, including interest—with the rate to be determined after further briefing; (ii) award her ongoing LTD benefits pursuant to the Plan; and, (iii) find she is a prevailing party and permitted leave to seek her attorneys' fees and costs.

* * * * * * * *

Date: February 4, 2022

Respectfully Submitted,

/s/ Andrew M. Grabhorn

Andrew M. Grabhorn, *pro hac vice*
*a.grabhorn@grabhornlaw.com*
**Grabhorn Law | Insured Rights®**
2525 Nelson Miller Parkway, Suite 107
Louisville, KY 40223
p: (502) 244-9331
f: (502) 244-9334

Jonathan K. Cohn (PA ID No. 92755)
*jcohn@stembercohn.com*
**STEMBER COHN &
DAVIDSON-WELLING, LLC**
The Hartley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA 15219
T.: (412) 338-1445
F.: (412) 338-1446

*Counsel for Plaintiff*